Abraham HENRY and Sally Henry, on their own behalf and as parents and next friend of their infant children Virginia, Abraham Earl, Mary Martha, Benjamin David, Abraham, Jr., Joe Carroll and Margaret Carroll, on their own behalf and as parents and next friend of their infant children Bonnie, Margaret, Lawrence, Debora, Roderick, Brenda, Patsy, Issac John, Jr. and Sarah John, on their own behalf and as parents and next friend of their infant children Marlene Jean, Alberta, Peter, Julie, Selina, Louise, Elliott Johnson, Jr. and Virginia Johnson, on their own behalf and as parents and next friend of their infant children John Jacob, Keefer, Keren, Mary, Elliott, Jerene, Alvin and Lawrence, all on their own behalf and on behalf of all other persons similarly situated, Plaintiffs,

v.

J. W. BETIT, Commissioner, Alaska Department of Health and Welfare, and Stanley P. Harris, Director, Division of Public Welfare, Defendants.

Civ. No. A-37-70.

United States District Court, D. Alaska.

Feb. 4, 1971.

G. E. Stein of Alaska Legal Services Corp., Anchorage, Alaska, for plaintiffs.

Charles K. Cranston, Asst. Atty. Gen. of Alaska, Anchorage, Alaska, for defendants.

Before HAMLEY, Circuit Judge, and PLUMMER and VON DER HEYDT, District Judges.

## OPINION

PLUMMER, District Judge.

Plaintiffs allege that they are the heads of households in which dependent children reside and that their respective net annual incomes, if determined in accordance with Alaska Welfare Manual § 4643.2, are not greater than the allowable maximum for determining assistance under Alaska's Aid to Families with Dependent Children Act, A.S. §§ 47.25.310–47.25.420 (Supp.1970) amending A.S. 47.25.310–47.25.420 (1962) [hereinafter referred to as Alaska's AFDC program].

For purposes of that Act, "dependent child" is a term of art defined as "a needy child under 18 years of age who is deprived of parental support or care by reason of the death, continued absence from the home, or physical or mental incapacity of a parent," who lives with his father, mother or certain other specified relatives. A.S. § 47.25.410 (Supp.1970).

Plaintiffs contend that their families are ineligible to receive benefits under the Alaska AFDC program solely because the need of their children is caused by the involuntary unemployment,[1] as

1. Plaintiffs aver in affidavits accompanying their complaint that they are registered with the nearest State Employment Serv-

ice Office and that they have not refused any offer of work since their last registration.

opposed to the death, absence or incapacity, of the father. Plaintiffs argue that this classification is inconsistent with the avowed purposes of the federal and state AFDC programs in that it provides incentive for unemployed fathers to desert their families in order to obtain the assistance needed to feed and clothe their children. This classification, they assert, places an invidious burden upon the integrity of their family relationships and deprives them of equal protection of the laws.

The case came before the court on plaintiffs' motion for summary judgment. At the conclusion of oral argument, defendants submitted a cross-motion requesting similar relief.

## JURISDICTION

■■ The court has jurisdiction to hear this case under 42 U.S.C.A. § 1983 (1970) [2] and 28 U.S.C.A. § 1343(3), (4) (1962).[3] The expanding scope of these statutes was explored recently in Eisen v. Eastman, 421 F.2d 560 (2d Cir. 1969). Attempting to reconcile the Supreme Court's acceptance of jurisdiction under these statutes in King v. Smith, 392 U.S. 309, 88 S.Ct. 821, 19 L.Ed.2d 869 (1968), which invalidated Alabama's AFDC "man in the house" regulations, with the more conservative interpretation of 28 U.S.C.A. § 1343 espoused by Mr. Justice Stone in Hague v. C. I. O., 307 U.S. 496, 518, 59 S.Ct. 954, 83 L.Ed. 1423 (1939),[4] Judge Friendly hypothesized that the Alabama statute "not merely caused economic loss to Mrs. Smith's children, but also infringed their liberty to grow up with financial aid for their subsistence * * *." 421 F.2d at 564. While this interpretation of King v. Smith has not been consistently adhered to, McCall v. Shapiro, 416 F.2d 246 (2d Cir. 1969), the Supreme Court continues to hear suits alleging wrongful deprivation of welfare benefits under 28 U.S.C.A. § 1343 (1962). Rosado v. Wyman, 397 U.S. 397, 403, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). We conclude that 28 U.S.C.A. § 1343 (1962) confers jurisdiction on district courts to hear claims arising under the Social Security Act.

2. Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

3. The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

 * * * * *

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

Although there is some question as to whether the Social Security Act "protects civil rights" or "provides for equal rights of citizens," the court in Eisen v. Eastman, 421 F.2d 560 at nn. 5 and 8 (2d Cir. 1969) concluded that where deprivation of constitutional rights is alleged 42 U.S.C.A. § 1983 and 28 U.S.C.A. § 1343 must be read in conjunction so that when a cause of action is stated under the former federal courts have jurisdiction under the latter.

4. In order to explain the jurisdictional overlap between 28 U.S.C.A. § 1331, which requires a jurisdictional amount of $10,000, and 28 U.S.C.A. § 1343, which has no jurisdictional amount, courts have generally adhered to Mr. Justice Stone's opinion concurring in the result in Hague v. C.I.O., 307 U.S. 496, 518, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) restricting suits under the latter statute to cases in which "the right or immunity is one of personal liberty, not dependent for its existence upon the infringement of property rights * * *." 307 U.S. at 531, 59 S.Ct. at 971.

McClellan v. Shapiro, 315 F.Supp. 484 (D.Conn.1970).

 This court is not deprived of jurisdiction by the Eleventh Amendment's prohibition of suits by individuals against the state. It is well established that a suit against a state official who is attempting to enforce an allegedly unconstitutional statute is not a suit against the state. Georgia R. R. & Banking Co. v. Redwine, 342 U.S. 299, 72 S.Ct. 321, 96 L.Ed. 335 (1952); Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). While there is no single rule for determining when a state is the real party in interest, if the suit demands a judgment which can only be satisfied by an appropriation from the public treasury it will be barred by the Eleventh Amendment. Harrison Construction Co. v. Ohio Turnpike Comm'n. 272 F.2d 337, 340 (6th Cir. 1959). The state argues that a judgment against them in this case would necessarily compel the Legislature to appropriate additional funds for welfare. Plaintiffs, however, have merely asked the court to order responsible state officials to disperse whatever public funds are presently available for welfare in an even-handed fashion. Such a judgment would not violate the Eleventh Amendment. *Compare* Williams v. Dandridge, 297 F.Supp. 450, 459 (D.Md.1968), rev'd on other grounds, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) and Dews v. Henry, 297 F.Supp. 587, 592 (D.Ariz. 1969) *with* Westberry v. Fisher, 309 F. Supp. 12, 18 (D.Me.1970). We conclude that the remedy prayed for in this case raises no Eleventh Amendment issues.

## THE MERITS

AFDC was established as a federal grant-in-aid program by Title IV of the Social Security Act of 1935. Act of Aug. 14, 1935, ch. 531, Title IV, 49 Stat. 627. The program, as initially enacted, authorized payments on behalf of children who have been "deprived of parental support or care by reason of the death, continued absence from the home, or physical or mental incapacity of a par-

ent * * *." 42 U.S.C.A. § 606(a) (1969). Alaska, as well as every other state, participates in this basic program on a matching fund basis. In order to qualify for federal funds the State must submit a plan "for the aid and services to needy families with children" to the Department of Health, Education and Welfare for the Secretary's approval. 42 U.S.C.A. § 602 (1969). Pursuant to these provisions, Alaska received approximately $1,383,300 in 1969 from the federal government.

In 1967 permanent legislation was enacted which made additional grants available to states wishing to provide assistance to children whose need is due to the unemployment of the father. 42 U.S.C.A. § 607 (1969) [hereinafter, AFDC–UP]. Although § 607 purports to amend the definition of needy child contained in § 606(a), AFDC–UP is optional and not applicable unless described in the plan submitted by the state to the Secretary. 42 U.S.C.A. § 607(b) (1969). Although only about one-half the states currently participate in the AFDC–UP program, plaintiffs contend that the State of Alaska may not refuse to participate in AFDC–UP without violating the Fourteenth Amendment rights of families whose need is distinguishable from that of AFDC families only in its origins.

At the outset, plaintiffs contend that the burden imposed by Alaska's AFDC program upon their right to maintain a family association requires that this court apply a strict, or "active", standard of review to the state's action.

The standard test for denial of the Fourteenth Amendment right to equal protection of the law is stated in Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1910):

"1. The equal protection clause of the Fourteenth Amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis, and

therefore is purely arbitrary. 2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety, or because in practice it results in some inequality. 3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. 4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary." 220 U.S. at 78–79, 31 S.Ct. at 340.

In cases where a state has made a "suspect classification" or allegedly infringed "fundamental rights" the standard of review is more strict. The court in these cases must closely scrutinize the state action to determine if it is justified by a *compelling* (as opposed to a merely rational) state interest, and will require that any legislation be tailored so as to impose the least intrusion upon the preferred rights.

The category of "suspect classifications" has been limited to discriminations whose proscription may be clearly inferred from the language and legislative history of the Fourteenth Amendment, such as those based on race, alienage and lineage. Developments in the Law: Equal Protection, 82 Harv.L.Rev. 1065, 1087–88 (1969). To date the Supreme Court has recognized only a few

rights not found in the Constitution which are so fundamental that their infringement requires similar protection.[5]

Plaintiffs argue that the right to maintain the integrity of one's family has been recognized as fundamental.[6] The contention that state welfare programs may not impose any burdens upon the sanctity of the family structure, however, was rejected by the Supreme Court in the recent case of Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), a case which we view as foreclosing any extension of the "fundamental right" doctrine into the welfare area. Upholding a Maryland AFDC maximum grant provision which placed a ceiling on the allowable aid to large families, the Court characterized welfare legislation as social and economic regulation which must be upheld if the state scheme bears a rational relationship to a legitimate state interest. The Court said:

"If this were a case involving government action claimed to violate the First Amendment guarantee of free speech, a finding of "overreaching" would be significant and might be crucial. For when otherwise valid governmental regulation sweeps so broadly as to impinge upon activity protected by the First Amendment, its very overbreadth may make it unconstitutional. * * * But the concept of "overreaching" has no place in this case. For here we deal with state regulation in the social and economic field, not affecting freedoms guaran-

---

5. *See, e. g.* Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (travel); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (voting); Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (criminal procedure); Skinner v. Oklahoma, ex rel. Williamson, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (procreation).

6. The importance of the family was recognized by implication in Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) in which the Court held that procreation

was one of the "basic civil rights of man." The Court has also shown special deference to familial relationships in Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) and Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). These cases, however, were decided in the context of a parents' quasi-first amendment right to direct the upbringing of the child. *See* Griswold v. Connecticut, 381 U.S. 479 (1965) at 482 (opinion of Mr. Justice Douglas) and 495 (opinion of Mr. Justice Goldberg), 85 S.Ct. 1678, 14 L.Ed.2d 510.

teed by the Bill of Rights, and claimed to violate the Fourteenth Amendment only because the regulation results in some disparity in grants of welfare payments to the largest AFDC families. For this Court to approve the invalidation of state economic or social regulation as 'overreaching' would be far too reminiscent of an era when the Court thought the Fourteenth Amendment gave it power to strike down state laws 'because they may be unwise, improvident, or out of harmony with a particular school of thought.' * * *

"In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' * * * 'The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.' * * * 'A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.' * * *

"To be sure, the cases cited, and many others enunciating this fundamental standard under the Equal Protection Clause, have in the main involved state regulation of business or industry. The administration of public welfare assistance, by contrast, involves the most basic economic needs of impoverished human beings. We recognize the dramatically real factual difference between the cited cases and this one, but we can find no basis for applying a different constitutional standard. * * * It is a standard that has consistently been applied to state legislation restricting the availability of employment opportunities. * * * And it is a standard that is true to the principle that the Fourteenth Amendment gives the federal courts no power to impose upon the States their views of·what constitutes wise economic or social policy." [7]

Plaintiffs argue that *Dandridge* is distinguishable in that it involved a ratable reduction in the grant to each child of a large family while all eligible needy children presumably continued to receive *some* aid. See 397 U.S. at 481, 90 S.Ct. 1153. In this case, however, the court is confronted with an eligibility requirement which cuts off all assistance to admittedly needy children. The burden on the family is correspondingly greater; for inasmuch as the parents might have "farmed out" some of their children to avoid the effects of the maximum grant limitation,[8] in the case at bar the father would have to desert *all* his children in order to qualify them for *any* benefits.

These distinctions are difficult to sustain in light of the clear wording of the opinion written by Mr. Justice Stewart, who has consistently maintained that the Court should not look outside the Constitution to find "fundamental rights." [8a] Moreover, it is difficult to distinguish between the situation in which the child is forced to leave the father and the one in which the father is forced to leave the child. Since the law only requires

7. 397 U.S. at 484–486, 90 S.Ct. at 1161 (citations and footnotes omitted).

8. The Supreme Court noted that "farming out" some children attenuates but does not destroy family relationships because the child must still live with relatives in order to qualify for AFDC. 397 U.S. at 480, 90 S.Ct. 1153.

8a. Some indication of the Court's unwillingness to closely scrutinize state wel-fare policy may be gleaned from Macias v. Richardson, 400 U.S. 913, 91 S.Ct. 180, 27 L.Ed. 153 (1970), which affirmed without opinion a three-judge court's decision upholding a California welfare regulation denying aid to needy children if the father works full time, regardless of whether the father's wages are sufficient to meet the family's needs. If the father is unemployed, under the California program, the family is eligible to receive AFDC–UP benefits.

that a fundamental right be burdened—not totally destroyed [9]—to justify active review, it is inconsistent to contend that a greater imposition upon family ties in the *Dandridge* case would have elicited a stricter standard of review.[10]

■ The question for decision, then, is whether there is a "reasonable basis" for dividing needy children into two categories—those whose need stems from the death, absence or incapacity of a parent, and those whose need is caused by the unemployment of the father.

Plaintiffs contend that the purpose of AFDC, as defined in 42 U.S.C.A. § 601 (1969)[11] and A.S. 47.25.400 (1962),[12] is to aid needy children and at the same time to strengthen family life by pro-

viding that assistance be channeled through the home. Classifications which are unrelated to, or which detract from, these fundamental purposes of AFDC have been stricken as arbitrary and violative of equal protection.[13] AFDC, however, is *also* designed to preserve in the parents "the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection." 42 U.S.C.A. § 601. To effectuate the goal of self-support and personal independence the state may structure its AFDC program to maximize incentives to seek employment as an alternative to welfare. Dandridge v. Williams, 397 U.S. 471, 486, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).[14]

---

9. The one year residence requirement for receipt of welfare, invalidated in Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), hardly *foreclosed* the right to interstate travel—it merely made exercise of that right more onerous.

10. The only case cited by plaintiffs in support of this interpretation of *Dandridge* is the decision of Leger v. Sailer, 321 F. Supp. 250 (E.D.Pa.1970). Since the state had denied all AFDC benefits to aliens, a "suspect classification" was clearly involved. We cannot agree with that court's alternate grounds for its decision.

11. For the purpose of encouraging the care of dependent children in their own homes or in the homes of relatives by enabling each State to furnish financial assistance and rehabilitation and other services, as far as practicable under the conditions in such State, to needy dependent children and the parents or relatives with whom they are living to help maintain and strengthen family life and to help such parents or relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection, there is authorized to be appropriated for each fiscal year a sum sufficient to carry out the purposes of this part.

12. The purpose of §§ 310–420 of this chapter is to encourage the care of dependent children in their own homes or in the homes of relatives by furnishing financial assistance and other services as far

as practicable to needy, dependent children and the parents and relatives with whom they are living to help maintain and strengthen family life, and to help the parent or relative to attain the maximum of self-support and personal independence consistent with the maintenance of continuing parental care and protection.

13. *See, e. g.,* Anderson v. Burson, 300 F. Supp. 401 (N.D.Ga.1968) where the court, employing the traditional standard of review, invalidated a state statute which denied assistance to mothers with earned income but allowed benefits to mothers with an equal amount of unearned income on the ground the source of income had no relationship to the determination of need. Similarly, the court in Smith v. King, 277 F.Supp. 31 (M.D. Ala.1967), also using the traditional equal protection test, invalidated Alabama's "man in the house" rule because the discouragement of illicit relationships was not related to the purpose of AFDC. The Supreme Court affirmed on statutory grounds without expressing an opinion concerning the equal protection issue. King v. Smith, 392 U.S. 309, 88 S.Ct. 821, 19 L.Ed.2d 869 (1968).

14. Plaintiffs argue that this objective is already achieved by the requirement that AFDC recipients be involuntarily unemployed. 42 U.S.C.A. § 602(a) (19) (F) (1969). This fact might be relevant if the standard of review required the state to use the least intrusive alternatives in effectuating its goals, but under the traditional standard of review the fact that

■ ■ Plaintiffs argue that even if encouragement of employment is an appropriate goal of the AFDC program, this objective is irrational when considered in light of the fact that wage employment is virtually non-existent throughout most of the year in rural Alaska. The effect of this requirement, however, may well be to encourage families to migrate to urban areas where employment and job training are more readily available. AFDC was not designed to provide a guaranteed annual income to those who are capable of gainful employment. If there are no jobs in rural Alaska, and no prospect that jobs will develop in these areas in the foreseeable future, then we cannot say that a governmental policy which promotes relocation is not reasonably related to a legitimate state interest.

Accordingly, summary judgment must be granted in favor of defendants.

alternative means are available and actually being employed is not conclusive. *See* Dandridge v. Williams, 397 U.S. 471 at 475 n. 3, 90 S.Ct. 1153, 25 L.Ed. 2d 491.