Robert FRANCIS, individually and on behalf of his minor children, Robert J. Francis, et al.

v.

Rita C. DAVIDSON, Secretary, Department of Employment and Social Services, and Raleigh C. Hobson, Director, Social Services Administration.

Department of Health, Education & Welfare, the U. S. Chamber of Commerce, the Maryland State Chamber of Commerce, and the Chamber of Commerce of Metropolitan Baltimore, Amici Curiae.

Civ. No. 71–853–K.

United States District Court,
D. Maryland.

Jan. 28, 1972.

C. Christopher Brown, Curtis L. Deck-er, and H. Maxwell Hersch, Baltimore, Md., for plaintiffs.

Francis B. Burch, Atty. Gen. of Md., and Richard G. McCauley, Joe Rabin and Judson F. Garrett, Jr., Asst. Attys. Gen., Baltimore, Md., for defendants.

George Beall, U. S. Atty., and Jean G. Rogers, Asst. U. S. Atty., Baltimore, Md., for Dept. of Health, Education & Welfare.

William A. Grimes, Baltimore, Md., Lawrence M. Cohen, Gerard C. Smetana, Chicago, Ill., and Alan Raywid, Washington, D. C., for The U. S. Chamber of Commerce.

J. Cookman Boyd, Jr. and Rob Ross Hendrickson, Baltimore, Md., for Maryland State Chamber of Commerce and the Chamber of Commerce of Metropolitan Baltimore.

Before WINTER, Circuit Judge, and KAUFMAN and YOUNG, District Judges.

FRANK A. KAUFMAN, District Judge.

This case involves constitutional and other issues arising in connection with the administration of the AFDC–E program.[1] Plaintiffs are fathers, who, on behalf of themselves and others similarly situated, allege that benefits under that program have been denied to their respective children by the Department of Employment and Social Services of the State of Maryland under Rule 200.X.A. (2) of that Department,[2] in violation of (a) 42 U.S.C. § 607[3] and 45 C.F.R. § 233.100(a),[4] and (b) the Fourteenth Amendment of the Federal Constitution. Defendants, named in their individual and representative capacities, are, respectively, the Secretary of the Maryland Department of Employment and Social Services and the Director of the Maryland Social Services Administration, a division of that Department.[5] HEW has submitted its views with regard to the issues in this case, pursuant to the request of this Court addressed to that agency in accordance with the strong policy suggestion stated by the Supreme Court of the United States in Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970).[6] The

1. AFDC-E (sometimes known as AFDC-UF, the UF standing for unemployed fathers vs. the E for employment or employed) is the short, commonly-used reference label for a program established by the Congress in 1961 pursuant to 42 U.S.C. § 607, providing aid for children in a family in which the father is unemployed. Prior to the enactment of that statute, there had been in existence a program known as AFDC pursuant to 42 U.S.C. §§ 601–606 under which aid was made available for children in families in which the father was absent from the home, incapacitated or dead. See King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). That program was continued in effect after the establishment of the AFDC-E program. Since 1961, the two programs have run side by side. Both depend upon a combination of federal and state funds and are administered by the states under regulations promulgated by the Department of Health, Education and Welfare (HEW) pursuant to statutory authority delegated to HEW by the Congress.

The history of AFDC is discussed in Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), and in Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). All states participate in AFDC. The history of AFDC-E is set forth in Macias v. Finch, 324 F.Supp. 1252 (N.D.Calif.1970). Twenty-two states and the District of Columbia presently participate in AFDC-E.

2. See n. 14 infra.

3. See n. 10 infra.

4. See n. 12 infra.

5. During the pendency of this case, Raleigh C. Hobson resigned as the Director of the Social Services Administration and his replacement, Dr. Irene Olson, automatically became a party defendant herein in his place and stead pursuant to Federal Civil Rule 25(d) (i).

6. Whenever possible the district courts should obtain the views of HEW in those cases where it has not set forth its views, either in a regulation or published opinion, or in cases where there is a real doubt as to how the Department's standards apply to the particular state regulation or program.
Rosado v. Wyman, supra at 407–408, 90 S.Ct. at 1215 (footnote omitted).

United States Chamber of Commerce and the Chamber of Commerce of Metropolitan Baltimore were permitted to file amicus briefs and to take part in oral argument.[7]

Robert Francis, one of the two original plaintiffs in this case, became out of work on July 1, 1971 when the union, of which he was a member, called a strike at the plant at which he was working. The other original plaintiff, Franklin Wilkens, was discharged from his employment on June 22, 1971 because of gross misconduct. Wilkens subsequently obtained new employment and withdrew his complaint herein. At the time of Wilkens' withdrawal, Edward Wright was granted leave to become a plaintiff herein.[8] Wright's employer discharged him on May 12, 1971 for alleged gross misconduct (excessive absenteeism). Both Francis and Wright (as well as Wilkens during the period he was out of work) applied for and were denied AFDC–E benefits by the Department of Social Services of the City of Baltimore. Wright is still out of work. Francis went back to work on September 10, 1971 when the strike which had been called by his union ended.

In the 1961 legislation originating the AFDC–E program, the term "dependent child" was defined in 42 U.S.C. § 607(a), Pub.L.No. 87–31, § 407, 75 Stat. 75 (1961), to include "a needy child" under the age of eighteen "who has been deprived of parental support or care by reason of the unemployment (*as defined by the State*)" of a parent, and who is living with any of his relatives "in a place of residence maintained by one or more of such relatives as his (or their) own home." (Emphasis added). In 1968, Congress enacted extensive amendments and, *inter alia,* replaced the word "parent" with the word "father," replaced the above italicized parenthetical words with the words "as determined in accordance with standards prescribed by the Secretary," and added 42 U.S.C. § 607(b), providing as follows:

The provisions of subsection (a) of this section shall be applicable to a State if the State's plan approved under section 602 of this title— [9]

(1) requires the payment of aid to families with dependent children with respect to a dependent child as defined in subsection (a) of this section when —

(A) such child's father has not been employed (*as determined in accordance with standards prescribed by the Secretary*) for at least 30 days

---

7. The United States Chamber of Commerce, which sought leave to intervene herein as a party under Federal Civil Rule 24(b), was given the opportunity, both in written and oral argument, to present its contentions against the background of proffered facts which the national Chamber stated it stood ready to prove if permitted to intervene as a party. In this opinion, this Court assumes, *arguendo* only, the correctness of those proffered facts, and for that reason, without determining whether such intervention would, in the words of Rule 24(b), unduly delay or prejudice the adjudication of the rights of the original parties," concludes that there is no reason to permit the same and accordingly hereby denies the said application to intervene.

8. The two original plaintiffs, Wilkens and Francis, as well as the plaintiff Wright, were permitted to proceed in forma pauperis after filing affidavits indicating their lack of funds and property.

9. 42 U.S.C. § 602 provides that each state shall have the right to submit its own plan for the administration of its AFDC–E program, provided same meets the standards of the statute. Congress is not required to provide funds to a state without such a program. King v. Smith, *supra*; Carroll v. Finch, 326 F.Supp. 891 (D.Alaska 1971); Woolfolk v. Brown, 325 F.Supp. 1162, 1170–1171 (E.D.Va. 1971); Cooper v. Laupheimer, 316 F. Supp. 264, 268 (E.D.Pa.1970). Nor is a state required to have an AFDC–E program. Henry v. Betit, 323 F.Supp. 418 (D.Alaska 1971).

All references in this opinion to the "Secretary" are to the Secretary of HEW, except to the extent that there is specific reference to the Secretary of the Department of Employment and Social Services of the State of Maryland.

prior to the receipt of such aid. [Emphasis added.][10]

After the 1968 statutory amendments by the Congress, the Secretary of HEW promulgated, as 45 C.F.R. § 233.100(a), a regulation, providing, *inter alia*, that "[i]f a State wishes to provide AFDC for children of unemployed fathers, the State plan * * * must, except as specified in paragraph (b) of this section[11] * * * [i]nclude a definition of an unemployed father * * * [and] shall include any father who is employed less than 30 hours a week, * * * *"[12]

Section 6 of Maryland's Unemployment Insurance Law, Md.Ann.Code art. 95A, § 6 (1969 Repl. Vol.), sets forth certain disqualifications for benefits and provides, *inter alia*, that an individual shall be disqualified for benefits when he is discharged for "gross misconduct" (section 6(b)), and when the Executive Director finds that "his *unemployment* is due to a *stoppage of work,* other than a lockout, which exists because of a labor dispute * * * [emphasis added]."[13]

Rule 200.X.A. of the Social Services Administration, Department of Employment and Social Services, of the State of Maryland, denies AFDC–E aid if the father is "disqualified for unemployment insurance."[14]

 Plaintiffs, on behalf of themselves and others similarly situated, seek injunctive and declaratory relief as well as damages in the form of the payment of AFDC–E benefits withheld by the State of Maryland pursuant to Rule

10. 42 U.S.C. § 607, in its entirety, as amended in 1968 and as presently in force and effect, is set forth in Appendix A. In addition to the amendments enacted by the Congress in 1968, certain other amendments, not material herein, have been made to 42 U.S.C. § 607 since the inception of the AFDC–E program.

11. The exceptions set forth in (b) are not material herein.

12. Effective October 1, 1971, the Secretary amended the regulation to substitute "100 hours a month" for "30 hours a week." 36 Fed.Reg. July 21, 1971.

That regulation also requires that any such plan shall provide for payments only if the "father has been unemployed for at least 30 days prior to the receipt of such aid" and only if the "father has not without good cause, within such 30-day period prior to the receipt of such aid, refused a bona fide offer of employment or training for employment" and only if the "father (a) has six or more quarters of work * * * [The regulation states that "[a] 'quarter of work' with respect to any individual means a period * * * in which he received earned income of not less than $50 * * * *."], within any 13-calendar-quarter period ending within 1 year prior to the application for such aid, or (b) within such 1-year period, received unemployment compensation under an unemployment compensation law of a State or of the United States, or was qualified

* * * for such compensation under the State's unemployment compensation law." The regulation further provides that "[a]n individual shall be deemed 'qualified' for unemployment compensation under the State's unemployment compensation law if he would have been eligible to receive such benefits upon filing application, or he performed work not covered by such law which, if it had been covered, would (together with any covered work he performed) have made him eligible to receive such benefits upon filing application." The regulation specifically calls for "the denial of * * * aid * * * [i]f, and for as long as, such child's father is not currently registered with the public employment offices in the State, and [w]ith respect to any week for which such child's father receives unemployment compensation under an unemployment compensation law of a State or of the United States."

45 C.F.R. § 233.100(a), 34 Fed.Reg. 1146 (1969), as continuously in force and effect since 1969, is set forth in Appendix B.

13. Md.Ann.Code art. 95A, § 6 is set forth in Appendix C.

14. Rule 200.X.A. provides, in part, as follows:

A grant may not be paid from GPA or AFDC-E:

* * * * *

2. To meet need due to being disqualified for unemployment insurance.

200.X.A.[15] Because injunctive relief is sought, *inter alia,* restraining state officials "from the enforcement, operation and execution of a statewide regulation on the ground of its unconstitutionality," King v. Smith, 392 U.S. 309 n. 3, 88 S.Ct. 2128, 2130, n. 3, 20 L.Ed.2d 1118 (1969), and because those allegations of unconstitutionality are not so frivolous or so obviously lacking in merit as not to require the convening of a three-judge court, *see* Md. Citizens for Representative General Assembly v. Governor of Maryland, 429 F.2d 606, 611 (4th Cir. 1970), this three-judge court was convened pursuant to 28 U.S.C. § 2281.

## I.

Plaintiffs assert jurisdiction in this case pursuant to 28 U.S.C. § 1343(3) [16] and (4),[17] which are jurisdictional counterparts of 42 U.S.C. § 1983,[18] the violation of which is alleged by plaintiffs. In a concurring opinion in Hague v. C. I.O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), Mr. Justice Stone wrote (at 531, 59 S.Ct. at 971) that section 1343(3) applied "whenever the right or immunity is one of personal liberty, not dependent for its existence upon the infringement of property rights." In Weddle v. Director, Patuxent Institution, 436 F.2d 342, 343 (4th Cir. 1970), Judge Winter, noting his acceptance of Judge Friendly's analysis in Eisen v. Eastman, 421 F.2d 560 (2d Cir. 1960), held that "[w]here, as here, the infringement is one solely of property rights, § 1331 is the applicable jurisdictional statute, and jurisdiction may be sustained only upon satisfaction of the amount in controversy requirement [footnote omitted]." [18a] *See also* Garren v. City of Winston-Salem, North Carolina, 439 F.2d 140 (4th Cir. 1970).

In King v. Smith, *supra,* the Supreme Court declared invalid as inconsistent with certain provisions of the Social Security Act, Alabama's "substitute father" regulation, pursuant to which Alabama denied AFDC aid to the children of a mother who "cohabits" in or outside her home with any single or married able-bodied man. In *King,* after noting the constitutional equal protection attack which had been held meritorious by the three-judge district court below, a view which Mr. Justice Douglas, concurring specially (392 U.S. at 334–336, 88 S.Ct. 2128), would have adopted in place of what he characterized (at 334, 88 S.Ct. 2128) as "the statutory route" followed by the majority of the Court, Mr. Chief

15. While exhaustion is not required in actions brought under 42 U.S.C. § 1983, and 28 U.S.C. § 1343, "where the constitutional challenge is sufficiently substantial, as here, to require the convening of a three-judge court," King v. Smith, *supra* at 312 n. 4, 88 S.Ct. at 2131 n. 4, plaintiffs herein have in fact exhausted their state administrative remedies.

16. 28 U.S.C. § 1343(3) and (4) provides:
The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
 \* \* \* \* \*
(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

17. See n. 20 *infra.*

18. 42 U.S.C. § 1983 provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

18a. In *Weddle,* an inmate in an institution alleged custodial officers had taken several items of his personal property.

Justice Warren, for the majority, wrote (at 313 n. 3, 88 S.Ct. at 2131):

> We intimate no views as to whether and under what circumstances suits challenging state AFDC provisions only on the ground that they are inconsistent with the federal statute may be brought in federal courts.

In Eisen v. Eastman, *supra*, 421 F.2d at 564, Judge Friendly suggested that "it is quite arguable that *King* came within Justice Stone's formulation on the basis that Alabama's 'substitute father' regulation not merely caused economic loss to Mrs. Smith's children, but also infringed their 'liberty' to grow up with financial aid for their subsistence and her 'liberty' to have Mr. Williams visit her on weekends."

In Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), in which a New York statute was held to have defined a standard of need for AFDC payments in violation of the federal statutory standard, Mr. Justice Harlan (at 405 n. 7, 90 S.Ct. at 1214) did not reach the issue posed by Mr. Justice Stone's formula in *Hague,* stating:

> Since we conclude that the District Court properly exercised its pendent jurisdiction, we have no occasion to consider whether, as urged by petitioners, this statutory claim satisfies the $10,000 amount-in-controversy requirement of the general federal jurisdiction provision, 28 U.S.C. § 1331, or whether it could be maintained under 28 U.S.C. § 1343(3), which contains no amount-in-controversy limitation, as an action "[t]o redress the deprivation, under color of any State law . . . of any right, privilege or immunity secured by . . . any Act of Congress providing for equal rights of citizens. . . . " See King v. Smith, 392 U.S., at 312 n. 3, [88 S.Ct. 2128, 20 L. Ed.2d 1118] see generally Note, Federal Judicial Review of State Welfare Practices, 67 Col.L.Rev. 84 (1967).

On the same day as *Rosado* was decided, the Supreme Court in Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), held valid and nonviolative of equal protection principles Maryland's placing of a dollar limit per month upon AFDC grants without regard to need or to size of family. In so doing, while the Supreme Court reversed the three-judge district court's contrary determination on the merits, it took no issue with the district court's holding that "[j]urisdiction is properly invoked under Civil Rights Act, 28 U.S.C.A. § 1343(3) and (4), and 42 U.S.C.A. § 1983 * * *." Williams v. Dandridge, 297 F.Supp. 450, 453 (D.Md.1968). Earlier, in Lewis v. Martin, 397 U.S. 552, 90 S. Ct. 1282, 25 L.Ed.2d 561 (1970), the Supreme Court held a California welfare regulation invalid upon statutory grounds without indicating any doubts as to the existence of jurisdiction. And still earlier, in a per curiam opinion in Shapiro v. Solman, 396 U.S. 5, 90 S.Ct. 25, 24 L.Ed.2d 5 (1969), the Supreme Court affirmed a three-judge district court opinion, 300 F.Supp. 409 (D.Conn. 1969), in which a Connecticut welfare practice was invalidated upon statutory grounds and in which section 1343(3) jurisdiction was held to exist. Most recently, in Townsend v. Swank, 404 U.S. 282, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971), reversing the judgment below for defendants in Alexander v. Swank, 314 F.Supp. 1082 (D.Ill.1971), the Supreme Court, in considering a challenge under 42 U.S.C. § 1983 to Illinois' AFDC program on the grounds that the latter was inconsistent with federal law and thus void under the Supremacy Clause, and was also violative of equal protection principles, raised no question concerning the assumption of jurisdiction by the court below and reversed on the ground that the Illinois statute and regulation conflicted with federal law and were invalid under the Supremacy Clause. Mr. Justice Brennan wrote that the Court therefore did not reach the equal protection issue (92 S.Ct. at p. 508). However, he did note (at p. 508 of 92 S.Ct.) that "we think there is a serious question whether the Illinois clas-

sification can withstand the strictures of the Equal Protection Clause." Concurring, Mr. Chief Justice Burger stressed that in his opinion the "appropriate inquiry in any case should be simply whether the State has indeed adhered to the provisions [of the federal statute] and is accordingly entitled to utilize federal funds in support of its program. Cf. Rosado v. Wyman, 397 U. S. 397, 420 [90 S.Ct. 1207, 25 L.Ed.2d 442] (1970)." (at p. 508 of 92 S.Ct.).

In Tichon v. Harder, 438 F.2d 1396 (2d Cir. 1971), Judge Anderson, in a case involving discharge of a probationary employee of Connecticut's Department of Welfare, wrote (at 1399): "It is apparent, however, as *Eisen* recognized, that some classes of cases are not readily characterized as involving either rights of personal liberty or property rights but take on characteristics of both. Cases challenging the procedures used in a discharge from public employment are such a class." In *Tichon*, the Second Circuit held (at 1402) that "in the absence of a clear, immediate and substantial impact on the employee's reputation which effectively destroys his ability to engage in his occupation,[19] it cannot be said that a right of personal liberty is involved" (footnote omitted), and also commented (at 1400) that "unlike welfare recipients, who exist at a bare subsistence level, it cannot be said that an employee's rights to the profits from his job entail 'some sort of right to exist in society.' Johnson v. Harder, 438 F.2d 7 (2 Cir. 1971)."

Johnson v. Harder, *supra*, involved a challenge to Connecticut's action in reducing AFDC payments to a mother with ten children by the amount of Old Age, Survivors and Disability Insurance benefits payable to two of the children because of the death of their father. Writing (438 F.2d at 12) that "[s]ince

welfare cases by their very nature involve people at a bare subsistence level, disputes over the correct amounts payable are treated not merely as involving property rights, but some sort of right to exist in society, a personal right under the Stone formula" (footnote omitted), and distinguished McCall v. Shapiro, 416 F.2d 246 (2d Cir. 1969), in which a Connecticut welfare regulation was challenged on appeal only upon statutory grounds and in which section 1343 jurisdiction was held lacking, Judge Smith, for himself and Chief Judge Lumbard and Judge Anderson, held (438 F.2d at 12) that "so long as a colorable constitutional claim has been raised, jurisdiction will properly lie." Holding the constitutional claim before it not to be insubstantial, the Court in Johnson v. Harder, *supra*, filed after the Supreme Court's opinion in Dandridge v. Williams, *supra*, held the constitutional (equal protection and due process) claims before it not "to be insubstantial in the light of the recent Supreme Court AFDC cases" (438 F.2d at 13).

Just a few days ago, in Russo v. Kirby, 453 F.2d 458 (2d Cir. 1971), Judge Hays, writing for himself and Judges Moore and Mulligan, in a class action case in which the district court had granted a preliminary injunction on the ground that the New York Social Services law's provision prohibiting the granting of welfare benefits to strikers infringed federal rights of the plaintiff-claimants, reversed the judgment of the district court below holding that no individual claim of any one plaintiff exceeded $10,000, that aggregation of claims was impermissible under Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969), that "no colorable constitutional claim is presented," citing Dandridge v. Williams, *supra*, as dispositive of the equal protection contention, and that accordingly no federal jurisdic-

---

19. The existence of such facts does seem to tip the scales towards the personal liberty side of the equation and to cause § 1343

(3) jurisdiction to be present. Birnbaum v. Trussell, 371 F.2d 672 (2d Cir. 1966).

tion existed under 28 U.S.C. § 1343 or under 28 U.S.C. § 1337.[19a]

Less than two years earlier, Judge Hays, concurring specially in a three-judge district court case, in McClellan v. Shapiro, 315 F.Supp. 484, 494 (D.Conn. 1970), expressed similar views in stating his disagreement with the majority's assumption of jurisdiction in a suit challenging the validity of Connecticut's definition of a "dependent child" in its AFDC program. Judge Blumenfeld, for the majority, held the Connecticut statute to be valid, after first determining at the threshold, in disagreement with Judge Hays, that jurisdiction was present under the authority of Judge Friendly's suggested reading of King v. Smith, *supra*, in Eisen v. Eastman, *supra*.

In Roberge v. Philbrook, 313 F.Supp. 608 (D.Vt.1970), Judge Leddy, after reviewing in depth, *inter alia*, Rosado v. Wyman, King v. Smith, Eisen v. Eastman, as well as numerous other federal court opinions rendered in jurisdictions outside the Second Circuit, held section 1343(3) jurisdiction to be present in a welfare case. In Henry v. Betit, 323 F. Supp. 418 (D.Alaska 1971), the Court, after referring to King v. Smith, Dandridge v. Williams, Eisen v. Eastman, McCall v. Shapiro, and McClellan v. Shapiro, also concluded that it had jurisdiction. In addition, *see* Caulder v. Durham Housing Authority, 433 F.2d 998 (4th Cir. 1970), in which the Fourth Circuit, in a post-*Weddle* opinion written by Judge Winter, assumed jurisdiction under 1343(3) in a 1983 case in which the right to inhabit a federally

assisted housing project was involved; and Wheeler v. Adams Company, 322 F. Supp. 645, 655 (D.Md.1971), in which such jurisdiction was similarly assumed in connection with a procedural due process attack upon certain replevin procedures.

■■ While it is the understatement of the new year 1972 to say that the matter is not free of doubt, this Court, in the absence of any clear guidance from the Supreme Court or from the Fourth Circuit, adopts the approach followed in Johnson v. Harder, *supra*, and holds that the alleged deprivation of AFDC–E benefits in this case constitutes an allegation of infringement of personal liberties and that the constitutional equal protection contentions advanced by plaintiffs herein, while rejected, are not frivolous. "[W]hether the complaint states a cause of action on which relief could be granted * * * must be decided after and not before the court has assumed jurisdiction over the controversy," Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939. (1946). Once having assumed jurisdiction because of the constitutional challenge, this Court believes that whether or not jurisdiction would otherwise exist, it should continue to assert its jurisdiction and proceed to resolve the issues herein involving federal statutes and federal regulations. The views stated by Mr. Justice Harlan in Rosado v. Wyman, *supra*, 397 U.S. at 402–403 and 422–423, 90 S.Ct. 1207, 25 L.Ed.2d 442, and by Mr. Chief Justice Warren in King v. Smith, *supra*, would appear so to teach.[20]

---

19a. See n. 20 *infra*.

20. This Court thus finds it unnecessary to determine if jurisdiction also exists in this case under 28 U.S.C. § 1343(4), or whether the *Hague-Eisen-Weddle* distinction applies in connection with § 1343(4) as well as § 1343(3). For opinion in which those two subsections have been, on the one hand, seemingly considered as one, and, on the other hand, as constituting separate jurisdictional bases, *see, e. g.*, Dale v. Hahn, 440 F.2d 633, 641 (2d Cir.

1971) ; Eisen v. Eastman, 421 F.2d at 562 n. 2; McCall v. Shapiro, *supra*; Roberge v. Philbrook, 313 F.Supp. at 614–615 n. 7. Nor does this Court reach the question of whether jurisdiction is present herein under 28 U.S.C. § 1337 which provides:

The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies.

## II.

Originally, in their complaint, plaintiffs asked this Court to permit this proceeding to take place as a class action under Federal Civil Rule 23(a) and (b) (2). During oral argument, counsel for plaintiffs stated agreement with a position suggested by this Court, namely, that if this Court should determine that it has no power to award damages in this case, there would be no need to form a class herein. Nevertheless, there may be reason to form the class herein, in order to avoid the possibility of mootness in view of the fact that the plaintiff Francis has returned to work (see p. 355 *supra*). *See* Doremus v. Board of Education, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952); and Troy State University v. Dickey, 402 F.2d 515 (5th Cir. 1968). *See also* SEC v. Medical Committee for Human Rights, 404 U.S. ——, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972); Barrows v. Jackson, 346 U.S. 249, 257 n. 3, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953); Smith v. Board of Education, 365 F.2d 770, 776 (8th Cir. 1966). While this Court recognizes that the continuing importance of the resolution of the issue relating to involvement in labor disputes·might cause the nonapplication of any principles of mootness, *see* ITT Lamp Division v. Minter, 435 F. 2d 989, 991 (1st Cir.), cert. denied, 402 U. S. 933, 91 S.Ct. 1526, 28 L.Ed.2d 868 (1971), reh. denied, 404 U.S. 874, 92 S. Ct. 27, 30 L.Ed.2d 120; Jenkins v. United Gas Corp., 400 F.2d 28 (5th Cir. 1968), this Court, because this action does fall rather precisely within the language of Federal Civil Rule 23(b) (2), hereby determines that this action shall be maintained as a class action on behalf of two separate subclasses, namely, (1) those who have applied unsuccessfully for AFDC–E benefits and have been involved in a labor dispute and (2) those who have also so applied and have been so denied because they have been discharged by their respective previous employers for misconduct. In so determining, this Court finds that each of the said two classes is so numerous that joinder of all members· is impractical; there are questions of law and fact common to the members of each of the said two classes; the claims of the respective parties herein are typical of the claims of all members of the class to which those representatives respectively belong; the representative parties will fairly and adequately protect the interests of the class; and counsel for the named plaintiffs have most diligently and competently represented the interests of the members of the two subclasses. Because the classes are designated pursuant to Rule 23(b) (2), no notice is required by Rule 23(c) (2). While, in some instances, notice to each member of the class may be required in order to avoid violation of due process principles, in this case, this Court, under the circumstances, holds that notice need not be given to each member of the two classes. If any retroactive payments are required (see the discussion at p. 371, *infra*), this Court has confidence that the federal and Maryland authorities will take appropriate steps to inform all persons entitled to such benefits of their rights thereto. For a discussion of notice requirements in class suits pursuant to Federal Rule 23, *see*, on the one hand, Johnson v. Georgia Highway Express, Inc., 417 F.2d 1122 (5th Cir. 1969); Northern Natural Gas Co. v. Grounds, 292 F.Supp. 619, 636 (D.Kan. 1968), as contrasted with Eisen v. Carlisle and Jacquelin, 391 F.2d 555 (2d Cir. 1968). *See also* 3B J. Moore, Fed-

In Russo v. Kirby, *supra*, Judge Hays held jurisdiction under § 1337 did not attach because the case did not arise "directly" under federal law. *Cf.* Barlow v. Marriott Corporation, 328 F.Supp. 624 (D.Md.1971). The possibility that § 1337 jurisdiction exists in this case has not been raised by counsel. Nor has this

Court found any cases other than *Russo* in which plaintiffs have challenged a state welfare statute or regulation as violative of welfare rights allegedly created by federal statutes or regulations and in which jurisdiction has been suggested under § 1337.

eral Practice, ¶ 2355 at 1152–53 (2d ed. 1969), favoring the views expressed in the first two cases that notice in a Rule 23(b) (2) case is not always required.

### III.

In Dandridge v. Williams, *supra*, 397 U.S. at 478, 90 S.Ct. at 1158, 25 L.Ed.2d 491, Mr. Justice Stewart wrote:

* * * In King v. Smith, supra, we stressed the State's "undisputed power," under these provisions of the Social Security Act, "to set the level of benefits and the standard of need." Id. at 334. [20 L.Ed.2d at 1135] * * * We described the AFDC enterprise as "a scheme of cooperative federalism", id. at 316 [20 L.Ed.2d at 1125] * * *, and noted carefully that "[t]here is no question that states have considerable latitude in allocating their AFDC resources, since each State is free to set its own standard of need and to determine the level of benefits by the amount of funds it devotes to the program." Id. at 318–319 [20 L.Ed.2d at 1126] * * *.

Those comments would seem to apply with equal force to the AFDC–E program. In *Dandridge,* Mr. Justice Stewart, speaking for a unanimous Court and holding that Maryland's administrative practice which imposed an upper limit on the total amount of money any one family unit might receive under the AFDC program, did not violate the Equal Protection Clause and was not in conflict with any provision of the Social Security Act, also wrote:

In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some "reasonable basis," it does not offend the Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality." * * * [at 485, 90 S.Ct. at 1161]

We do not decide today that the Maryland regulation is wise, that it best fulfills the relevant social and economic objectives that Maryland might ideally espouse, or that a more just and humane system could not be devised. Conflicting claims of morality and intelligence are raised by opponents and proponents of almost every measure, certainly including the one before us. But the intractable economic, social, and even philosophical problems presented by public welfare assistance are not the business of this Court. The Constitution may impose certain procedural safeguards upon systems of welfare administration, Goldberg v. Kelly, 397 U.S. 254 [90 S. Ct. 1011, 25 L.Ed.2d 287] [1970]. But the Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients. [citations omitted] [at 487, 90 S.Ct. at 1162].

*See also* Richardson v. Belcher, 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (November 22, 1971).

In this case, plaintiffs urge that Maryland's Rule 200.X.A.(2) discriminates without rational basis against certain children whose fathers happen to be out of work because of their own misconduct which justified their discharge by their employer, or because of a labor dispute. Plaintiffs stress the need to focus upon the welfare of each child and to disregard other factors such as whether the overall public policy of a state is furthered by denying AFDC–E benefits to children of such fathers. The State of Maryland, relying largely upon Dandridge v. Williams, *supra*, contends that Maryland, through the power granted to it to enact certain standards, on a cooperative basis with the Federal Government, possesses the right to make policy determinations of the type underlying the two applications of Maryland Rule 200.X.A.(2) which are challenged herein, and that it is not up to the courts to question the wisdom of the State of Maryland in so doing. The United States Chamber of Commerce and the

state and local Chambers of Commerce, as amici herein, urge this Court to hold the Maryland Rule, denying AFDC–E benefits to children of fathers out of work because of involvement in labor disputes, valid because a contrary rule would be in conflict, under the Supremacy Clause of the Constitution, Article VI, with federal statutes enacted by the Congress in the field of labor relations.[21] The United States Chamber of Commerce unsuccessfully took that same position in ITT Lamp Division v. Minter, 435 F.2d 989 (1st Cir.), cert. denied, 402 U.S. 933, 91 S.Ct. 1526, 28 L.Ed.2d 868 (1971), pet. for reh. denied 404 U.S. 874, 92 S.Ct. 27, 30 L.Ed.2d 120, in which the Massachusetts AFDC–E program, which *permits* aid to fathers out of work because of involvement in labor disputes, was held not in conflict with any federal statutes. HEW, in its presentation to this Court, contends that a state is constitutionally permitted to follow both of the two Maryland practices under attack in this case, or practices contrary and opposite thereto. This Court believes that the HEW position is sound.

Dealing first with the constitutional challenge relating to labor disputes, this Court is of the opinion that rational bases exist for Maryland's position denying AFDC–E benefits to children of fathers who are out of work because of labor disputes, just as there are rational reasons for the opposite view which has been adopted by most of the states.[22] Thus, the equal protection challenge to Maryland's denial of benefits to such fathers must be rejected.

Nor has the Congress, by the enactment of labor laws having national scope, in any way, by the terms of those statutes or. otherwise, indicated that those laws or the policies underlying them are intended to control the resolution of those opposing viewpoints of social welfare which underlie the differences between the Maryland and the contrary rules relating to the grant or. denial of AFDC–E benefits .to those out of work because of involvement in labor

---

21. The three Chambers of Commerce take no position with regard to the validity of the Maryland Rule insofar as it denies benefits to children of fathers who are disqualified from receiving Maryland unemployment compensation benefits for reasons other than those relating to stoppage of work because of labor disputes.

22. The State of Maryland, in a memorandum filed in this case, has set forth the following "separate, although somewhat related, bases upon which the Rule may be justified:"

1. To harmonize the State's unemployment compensation program and its AFCD–E program, both such programs being employment programs and both being cut from the same fabric of cooperative federalism woven by the Social Security Act.

2. To discourage voluntary unemployment and thereby to promote employment in the State.

3. In the case of economic strikers, to maintain the largest measure of neutrality in collective bargaining and strikes, so as not to incur the risk of adversely affecting employment in, and the economy of, the State.

HEW has informed this Court that, in addition to Maryland, 22 states currently have AFDC–E programs and that of those 22, one denies benefits to those in need as a result of involvement in labor disputes, two so deny benefits unless the involvement is due to a lockout, two so deny benefits unless the strike in question is "legal," and one is new to the program and HEW has no knowledge as yet concerning that state's plan in this connection. HEW has further written to this Court that "[a]s far as it knows, Maryland is the only state" which "conditions eligibility for AFDC–UF [see n. 1 *supra*] on eligibility for unemployment compensation," but that the questionnaire HEW has addressed to the states "did not specifically address itself to such restrictions, and there is, therefore, at least a possibility that similar provisions exist in other state AFDC–UF plans." The State of Maryland has furnished information to this Court which may indicate that at least one other state may not permit strikers to register for the retraining and/or reemployment which is a condition precedent to the grant of AFDC–E benefits.

disputes. In *Minter*, 435 F.2d at 992–993, Judge Coffin has written:

> \* \* \* Where Congress has not clearly manifested its purpose to exclude state action which takes the form of exercise of its historic police powers, such state action will not be invalidated under the Supremacy Clause, "in the absence of persuasive reasons", Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142 [83 S.Ct. 1210, 10 L.Ed.2d 248] (1963), or unless the administration of the state law "palpably infringes" upon the federal policy. Southern Pac. Co. v. Arizona ex rel. Sullivan, 325 U.S. 761, 766 [65 S.Ct. 1515, 89 L.Ed. 1915] (1945). *See also* Head v. New Mexico Bd. of Examiners, 374 U.S. 424 [83 S.Ct. 1759, 10 L.Ed.2d 983] (1963); Buck v. California, 343 U.S. 99 [72 S.Ct. 502, 96 L.Ed. 775] (1952). [Footnote omitted.]

Judge Coffin's statement, written in the context of labor disputes, would seem equally applicable with regard to the attack under the Supremacy Clause upon Maryland's denial of aid to children of fathers discharged from their last employment because of misconduct. And the reasons which require rejection of the equal protection challenge upon denial of aid in connection with labor disputes also dispose of that challenge with regard to loss of work because of gross misconduct. Accordingly, the constitutional challenge stated by plaintiffs is rejected, *in toto*.[23]

## IV.

Plaintiffs also contend that the Maryland Rule is in conflict with the federal statute and the HEW regulation promulgated thereunder. Analyses of the provisions of 45 C.F.R. § 233.100, on the one hand, and section 6 of the Maryland Unemployment Insurance law, on the other hand, show that all of the Maryland disqualifications are also disqualifications under the federal regulation, other than pregnancy which does not apply to fathers, participation in labor disputes, gross misconduct, discharge or suspension as a disciplinary measure, and voluntarily leaving prior employment.[24] The specific issue which

23. Having so disposed of the constitutional attack, this three-judge court could dissolve itself and return the question of the determination of the alleged conflict between the Maryland Rule and the federal statute and regulation, to the single district judge to whom this case was originally assigned. However, in accordance with the discretion of a three-judge court (which is properly convened to consider a nonfrivolous constitutional challenge) to retain jurisdiction with regard to the nonconstitutional issues, this three-judge court, in view of the importance of the issues set forth herein, has determined not to dissolve itself and to reach, as a three-judge court, the nonconstitutional issues presented herein. In Rosado v. Wyman, 397 U.S. *supra* at 403, 90 S.Ct. at 1213, Mr. Justice Harlan, approving the dissolution of a three-judge district court where a constitutional claim had been declared moot, wrote:

> \* \* \* Even had the constitutional claim not been declared moot, the most appropriate course may well have been to remand to the single district judge for findings and the determination of the statutory claim rather than encumber the district court, at a time when district court calendars are overburdened, by consuming the time of three federal judges in a matter that was not required to be determined by a three-judge court.

However, since the holding herein probably renders any further proceedings (see the discussion at p. 371 *infra*) unnecessary and since all three of the members of this three-judge court have participated in the formulation of this opinion, this Court has determined not to dissolve itself and not to remand this case to the single judge to whom the complaint was originally presented. *See also* Woolfolk v. Brown, 325 F.Supp. 1162, 1163 (E.D.Va.1971); C. Wright, Law of Federal Courts § 50, pp. 190–91 (2d ed. 1970).

24. HEW, in its memorandum filed in this case, argues that the Maryland Rule 200.X.A. (2), by denying AFDC–E benefits to those disqualified under Maryland's Unemployment Compensation law, "avoids the anomaly of denying" those benefits to those "who receive unemployment insurance benefits while providing" them "to individuals who are disqualified

accordingly is presented herein is whether gross misconduct and discharge or suspension as a disciplinary measure, or disqualification because of involvement in a labor dispute, can be made disqualifications in a state's AFDC–E program, without that state violating federal statutory and/or regulatory requirements.

■ It is conceded in this case by respondents that each of the plaintiffs not only qualifies as needy, but also took all steps in accordance with 45 C.F.R. § 233.100, including both application for employment and readiness to take part in retraining, preliminarily necessary to place himself in position to obtain AFDC–E benefits, and that he would have received such benefits had he not, in the case of the plaintiff Wright, been discharged for alleged misconduct, and, in the case of the plaintiff Francis, been out of work because of the strike called by his union. As discussed *infra*, 45 C. F.R. § 233.100(a) provides that "if a State wishes to provide AFDC for children of unemployed fathers the State Plan * * * *must* * * * [i]nclude a definition of an unemployed father * * * which shall include any father" who is employed less than a given number of hours and which may include any father who is employed for a certain number of other hours. Thus, HEW used mandatory language, i. e., that the state plan *must* include any father who is employed less than a given number of hours. There is nothing in the regulation which permits a state plan to deny benefits under the state's AFDC–E program, on the ground that the father of the needy child is unemployed because his discharge from employment was due to his own misconduct. Such a father is clearly not employed. Consequently, Maryland Rule 200.X.A. (2), insofar as it attempts to transplant, within the framework of Maryland's AFDC–E program, the disqualification requirements of sections 6(b) and/or (c) of the Maryland Unemployment Compensation law, is violative of HEW's regulation. The fact that HEW has itself, by approving the Maryland plan, given approval to such violation in no way deprives the plaintiff Wright, and others similarly situated, from requiring that the Maryland AFDC–E program be administered in accordance with the HEW regulation. Respondents and HEW urge upon this Court that HEW's approval of the Maryland Rule in question is presumptively valid since (1) the Congress delegated broad rule-making powers to HEW in connection with administering the program, (2) HEW, in promulgating its regulation, left great leeway for each state to determine many details in its own plan,[25] and (3) HEW approved the Maryland Rule. It is true that such approval is entitled to considerable weight by this Court, *see* Rosado v. Wyman, *supra*, 397 U.S. at 406, 90 S.Ct. 1207, 25 L.Ed.2d 442; King v. Smith, *supra*, 392 U.S. at 334, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (Douglas, J., concurring); Udall v. Tallman, 380 U.S. 1, 4, 16 and ff., 85 S. Ct. 792, 13 L.Ed.2d 616 (1965); Jno. McCall Coal Company, Inc. v. United States, 374 F.2d 689, 692 (4 Cir. 1967), particularly when the Congress has delegated policy-making to the agency. Davis, Administrative Law § 5.05. But, once an administrative agency has promulgated a regulation, even in instances where it is not required to do so, that administrative agency is bound to follow its regulation. United States v. Heff-

for unemployment insurance benefits because of their own acts." But the answer is that there can reasonably be differences of opinion as to whether such an anomaly exists; further, in any event, Maryland, by neither statute nor rule, can exclude from the beneficiary class under Maryland's AFDC–E program those whom the Congress or the Secretary of HEW have required to be included.

25. A reading of the text of 45 C.F.R. § 233.100(c) clearly demonstrates that leeway. See Appendix B. The legislative history of 42 U.S.C. § 607 indicates neither the presence nor absence of any congressional intent in connection with disqualification for AFDC–E benefits because of discharge for misconduct.

ner, 420 F.2d 809 (4th Cir. 1970); United States ex rel. Brooks v. Clifford, 409 F.2d 700 (4th Cir. 1969); Hammond v. Lenfest, 398 F.2d 705 (2d Cir. 1968). *Cf.* Townsend v. Swank, *supra.* That is particularly true where the regulation uses unambiguous, mandatory language. A man out of work because he was discharged for cause by his employer *is unemployed.* There can be no two ways about that conclusion. Accordingly, this Court holds that the disqualification in Maryland's Rule 200.X.-A. (2) of fathers who were discharged because of gross misconduct or as a disciplinary measure, is in conflict with 45 C.F.R. § 233.100(a) and that the said Maryland Rule is invalid insofar as that disqualification is concerned.

The wording of 45 C.F.R. § 233.100(a) also requires a similar holding with regard to Maryland's denial of AFDC–E benefits to those out of work because of labor disputes. While the legislative history of 42 U.S.C. § 607 throws little light on the subject,[26] it is contended that the provisions of the statute,[27] which indicate the emphasis Congress placed upon retraining, preclude the payment of AFDC–E benefits to strikers. However, persons out of work because of a labor dispute certainly have been known to find new jobs during the period of the labor dispute and thereafter not to return to the old job. And, in the case at bar, it is stipulated that the plaintiff Francis did apply for a new job and did agree to take part in the required training.[28]

In King v. Smith, *supra,* the Supreme Court analyzed the purposes of the AFDC program and concluded that the Alabama regulation, which, the State of Alabama contended, was intended to discourage immorality and illegitimacy and also to avoid unfairly penalizing families where an official marital relationship existed, was inconsistent with the statute on the ground that Congress intended to include in the category of the word "parent" a person who had a legal obligation to support the child in question. With regard to the immorality point, the Supreme Court, 392 U.S. at 324–325, 88 S.Ct. at 2137, stated that federal public welfare policy "now rests on a basis considerably more sophisticated and enlightened than the 'worthy person' concept of earlier times. * * * In sum, Congress has determined that immorality and illegitimacy should be dealt with through rehabilitative measures . . . ." Thus, the Supreme Court, in King v. Smith, found that the justifications which the State of Alabama offered were incompatible with

26. See Appendix D.

27. See Appendix A.

28. Nor does the usage of the word "employed" or similar words in other contexts compel any one meaning of the word "unemployment" as used in 42 U.S.C. § 607 or the word "employed" as used in 45 C.F.R. § 233.100(a). The Federal Bureau of Labor Statistics classifies persons out of work because of involvement in labor disputes as "employed persons" rather than "unemployed persons." However, it must be noted that the Bureau classifies some persons who might well be thought by the average person to be unemployed, as neither "employed" nor "unemployed," but rather in the "not in the labor force grouping." An example is persons who are "voluntarily idle." *See* Handbook of Labor Statistics (1970), U. S. Dept. of Labor, Bureau of Labor Statistics Technical Notes, Current Population Survey, pp. 1 & 2. Thus, the Bureau's classifications are not too helpful in the context of this case where it is necessary to decide if claimants for AFDC–E benefits are either employed or unemployed. Under the National Labor Relations Act, a striker continues to have rights to his job and to his employee status. 29 U.S.C. § 152(3). *See also* NLRB v. Mackay Radio & Teleg. Co., 304 U.S. 333, 345, 58 S.Ct. 904, 82 L.Ed. 1381 (1938); Mooresville Cotton Mills v. NLRB, 97 F.2d 959, 961 (4th Cir. 1938). Turning to section 6(e) of the Maryland Unemployment Insurance law, it is noted that that section specifically refers to "unemployment * * * due to a stoppage of work." Thus, the State of Maryland, under that law, classifies those involved in labor disputes as unemployed; however, it then disqualifies such persons from collecting unemployment compensation.

the federal congressional purpose. In this case, the State of Maryland, and the Chambers of Commerce, particularly the national Chamber of Commerce, strenuously urge this Court to hold that the Congress has clearly indicated, through its labor legislation, and in other ways that it did not intend to lend governmental support to those out of work because of labor disputes and that therefore the word "unemployment," as used in the statute and defined in the regulation by HEW, should be read to exclude such persons. The difficulty with that approach is that it is a boot strap one because there is little or nothing in the legislative history, or in the words of the statute itself, or in the words of the regulation, or indeed in the advice received by this Court from HEW, to indicate whether the word "unemployment," as used in the statute and amplified in the regulation, was or was not intended to include such persons. Perhaps it is in recognition of that fact that HEW would have us go both ways and say that the Congress empowered HEW to leave to each participating state—and that HEW in turn by its regulation has left to each state—the determination of whether the word "unemployment," in the context of a state's own AFDC–E program, includes or excludes such persons. In support of that view, it is to be noted that when Congress removed the parenthetical words "as defined by the State," and substituted the words "as determined in accordance with standards prescribed by the Secretary," Congress did not simply substitute the words "as determined by the Secretary." Thus, Congress used words which did not mandatorily require the Secretary to require each state to adopt the same meaning of the word "employment" but instead merely *authorized* the Secretary to prescribe a national meaning if the Secretary so desired. In so doing, this Court agrees that the Congress empowered the Secretary, by regulation, to require each participating state (1) to in-

clude or (2) to exclude from its respective AFDC–E program those out of work because of involvement in labor disputes, or (3) to leave that decision to each state. A quick look at 45 C.F.R. § 233.100(a) (1) (ii) reveals a specific instance in which each state is given the power of definition by the Secretary.[28a] Thus, the Secretary demonstrated that he knew exactly how to state clearly when he desired to leave a matter to the discretion of each state. By contrast, the language of 45 C.F.R. § 233.100(a) (1) (i) is crystal clear, i. e., " * * * the State Plan * * * *must* * * * *include a definition* of an employed father * * *, which *shall* include a father who is *employed less than* 30 hours a week [amended effective October 1, 1971 to be "100 hours per month"] *or less* than three quarters of a number of hours considered by the industry to be full time for the job, whichever is less * * *." (Emphasis added). The presence of those words renders the Secretary's regulation incapable of being construed in more than one of the three ways left open to the Secretary by the Congress. A father who is not working at all because of his involvement in a labor dispute is a father who "is employed less than 30 hours a week" and less than three quarters of his industry's average. Whether the word "unemployment" covers or does not cover persons out of work because of labor disputes, the Secretary, acting under the authority delegated to him by the Congress, mandatorily, by the unequivocal words of his own regulation, required that each state's plan must include all fathers, who otherwise qualify, who *are employed less* than a given number of hours. In order otherwise to qualify, such a father must not have available to him from his own resources or other sources including strike benefits assets or income which place him outside of the needy category. Further, he must register for other work and for retraining and accept and participate in both in good faith. Con-

28a. See Appendix B.

sidered in their sum total, the statute and the regulations provide safeguards to ensure that only needy fathers who are willing to be retrained if necessary, and to engage in other employment, can qualify for benefits which are made available primarily to help the children of such fathers. In Townsend v. Swank, *supra*, in which the Supreme Court held invalid that part of Illinois' AFDC program under which certain needy dependent children attending high school or vocational school were eligible for benefits, but those attending college or university were not, Mr. Justice Brennan (at p. 505 of 92 S.Ct.) wrote:

> Thus King v. Smith establishes that, at least in the absence of congressional authorization for the exclusion clearly evidenced from the Social Security Act or its legislative history, a state eligibility standard that excludes persons eligible for assistance under federal AFDC standards violates the Social Security Act and is therefore invalid under the Supremacy Clause. We recognize that regulations of the Department of Health, Education, and Welfare seem to imply that States may to some extent vary eligibility requirements from federal standards. However, the principle which accords substantial weight to interpretation of a statute by the department entrusted with its administration is inapplicable insofar as those regulations are inconsistent with the requirement of § 402(a) (10) that aid be furnished "to *all eligible* individuals." (Emphasis supplied.) King v. Smith, 392 U.S. at 333 n. 34. [88 S. Ct. 2128, 20 L.Ed.2d 1118] [Footnote omitted.]

The following paraphrase of Mr. Justice Brennan's last-quoted sentence controls this case as to those involved in labor disputes: The principle which accords substantial weight to an agency's interpretation of its own regulation is inap-plicable insofar as that interpretation is inconsistent with the requirements (in this case, mandatory requirements) of its own regulation validly promulgated under authority delegated to it by the Congress.[29] The Secretary could have authorized Maryland to exclude from AFDC–E benefits those out of work because of labor disputes. But, by regulation, the Secretary mandatorily required the opposite, and having so done, he may not ignore his own regulation. Accordingly, this Court holds that Maryland's Rule 200.X.A. (2), insofar as it denies AFDC–E benefits to those out of work because of involvement in labor disputes, conflicts with the federal regulatory requirements promulgated by the Secretary, and that the plaintiff Francis and others similarly situated are entitled to relief herein.

■ It follows from our conclusion that Maryland's program, insofar as Maryland fails to afford AFDC–E relief where fathers are out of work because of gross misconduct or because of involvement in labor disputes, is incompatible with federal regulatory requirements, and that the plaintiff Wright and others similarly situated and the plaintiff Francis and others similarly situated "are entitled to declaratory relief and an appropriate injunction by [this Court] against the payment of *federal* monies" in contravention of this Court's holding here, "should the State not develop a conforming plan within a reasonable period of time," Rosado v. Wyman, 397 U.S. *supra* at 420, 90 S.Ct. at 1222 (emphasis by Mr. Justice Harlan). This Court, having confidence that, if this Court's holdings herein become final, the State of Maryland will conform its plan, effective as of the date of the filing of this opinion and as required by this Court's declaration of the law herein, finds it unnecessary, at this time, to enjoin or otherwise issue any order to respondents herein.[29a]

---

29. *See also* Heffner v. United States, *supra*; United States ex rel. Brooks v. Clifford, *supra*; Hammond v. Lenfest, *supra*.

29a. The said obligations of the State of Maryland hereunder with regard to the labor involvement issue will of course be different if, forthwith, after the filing of

## V.

Maryland is required to disperse whatever public funds are available for AFDC–E benefits in accordance with this opinion. Rosado v. Wyman, *supra.*[30] *See* Henry v. Betit, 323 F.Supp. 418, 421 (D.Alaska 1971); Dews v. Henry, 297 F.Supp. 587–592 (D.Ariz.1969). But there remains the question of whether the plaintiff Wright and the plaintiff Francis and others respectively similarly situated are entitled to be paid AFDC–E benefits not only prospectively from and after the date of the filing of this opinion, but retroactively. In Westberry v. Fisher, 309 F.Supp. 12 (D. Maine 1970), upon remand by a three-judge court to him as a single judge for determination of damage claims, Judge Gignoux was faced with a claim for retroactive AFDC benefits withheld during the period from the date of the filing of the complaint by the plaintiffs in that case, in which a class was established under Federal Civil Rule 23. Judge Gignoux held the defendants, who were state officials, not personally liable for damages under 42 U.S.C. § 1983, since those officials had acted "in good faith in performance of their official duty as they understood it." 309 F.Supp. *supra* at 18. In this case, there are no allegations that any of the defendant state officials did not perform their official duty in good faith as they understood that duty. While state officials are liable under section 1983, under the doctrine of Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and although Pierson v. Ray, 386 U.S. 547, 554, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967), only goes so far as to say that Congress, in enacting section 1983, did not intend "to abolish wholesale all common-law immunities," and while the Supreme Court "has not definitively spoken on the applicability of the doctrine of governmental immunity"[31] in actions brought under section 1983 against state administrative officials, this Court, as did Judge Gignoux, adopts Judge Magruder's views as expressed in Cobb v. City of Malden, 202 F.2d 701 (1st Cir. 1953), and in Francis v. Lyman, 216 F. 2d 583 (1st Cir. 1954). In the latter case, Judge Magruder concluded (at 588) that while "it is no defense to the state officials that they may have acted, not maliciously, but in the good-faith belief that they were performing their official duty under what they thought was valid state legislation" where they are dealing with problems of race discrimination, and may therefore be "said to act at their peril" in such situations, nevertheless, in other situations, "it seems to

---

this opinion, the Secretary of HEW amends 45 C.F.R. § 233.100(a) in accordance with the discretionary authority conferred upon him by, and within the confines of, 42 U.S.C. § 607 as construed in this opinion.

30. Mr. Justice Harlan, in Rosado (at 420–421, 90 S.Ct. at 1222) wrote:

> We have considered and rejected the argument that a federal court is without power to review state welfare provisions or prohibit the use of federal funds by the States in view of the fact that Congress has lodged in the Department of HEW the power to cut off federal funds for noncompliance with statutory requirements. We are most reluctant to assume Congress has closed the avenue of effective judicial review to those individuals most directly affected by the administration of its program. Cf. Abbott Laboratories v. Gardner, 387 U.S. 136 [87 S.Ct. 1507, 18 L.Ed.2d

681] (1967); Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, [90 S.Ct. 827, 25 L.Ed. 2d 184] (1970); Barlow v. Collins, 397 U.S. 159 [90 S.Ct. 832, 25 L.Ed.2d 192] (1970). We adhere to King v. Smith, 392 U.S. 309 [88 S.Ct. 2128, 20 L.Ed. 2d 1118] (1968), which implicitly rejected the argument that the statutory provisions for HEW review of plans should be read to curtail judicial relief and held Alabama's "substitute father" regulation to be inconsistent with the federal statute. While King did not advert specifically to the remedial problem, the unarticulated premise was that the State had alternative choices of assuming the additional cost of paying benefits to families with substitute fathers or not using federal funds to pay welfare benefits according to a plan that was inconsistent with federal requirements.

31. 309 F.Supp. *supra* at 16.

**370**

be the tendency of the decisions to restrict the application of the Civil Rights Act so as to avoid the appalling inflammation of delicate state-federal relationships which undoubtedly would ensue." *See also* the citations in Westberry v. Fisher, 309 F.Supp. *supra* at 17, of the opinions of other courts and writers written both before and after the Supreme Court's pronouncements in *Pierson*, which have followed Judge Magruder's approach, and the observation of Professor Davis that Judge Magruder's approach "seems likely to control the law of the future." 3 Davis, Administrative Law § 26.06, pp. 478–479 (1958).

■ To the extent plaintiffs seek to hold defendants herein liable for damages under section 1983 in their official capacities as officers of the State of Maryland, "such a suit is in actuality one against the State, even though the State is not named as a defendant." [32] Westberry v. Fisher, *supra*, 309 F.Supp. at 18, and cases cited thereat. *See also* O'Neill v. Early, 208 F.2d 286, 289 (4th Cir. 1953).

■ Approaching the case as one against the State, all claims herein for damages must fail. In the first place, the State is not a person within the meaning of section 1983. Monroe v. Pape, *supra*, 365 U.S. at 187–192, 81 S.Ct. 473, 5 L.Ed.2d 492; Hewitt v. City of Jacksonville, 188 F.2d 423 (5th Cir.), cert. denied, 342 U.S. 835, 72 S.Ct. 58, 96 L.Ed 631 (1951); Westberry v. Fisher, *supra*, 309 F.Supp. at 18.

■ In the second place, the Eleventh Amendment [33] not only bars, without the consent of a state, a federal court suit against that state by citizens of another state, but also by citizens of its own state. Great Northern Life Insurance Co. v. Read, 322 U.S. 47, 51, 64 S.Ct. 873, 88 L.Ed. 1121 (1944); Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890); Westberry v. Fisher, *supra*, 309 F.Supp. at 18. In this case, the defendants, speaking on behalf of the State of Maryland, have not only not waived that bar but indeed vigorously press it. Thus, at the very least, as Judge Winter wrote in Williams v. Dandridge, 297 F.Supp. 450, 452 n. 1, 469 (D.Md.1968), the Eleventh Amendment does not permit this Court to require the State of Maryland to appropriate additional money to pay AFDC–E claims which would have been presented to and paid by the State of Maryland in years prior to the current fiscal year but for the disqualifying provision of Maryland Rule 200.X.A. (2).[34] Additionally, this Court holds that the Eleventh Amendment, when asserted on behalf of the State as it is herein, precludes this Court from requiring payment of any such claims which have arisen, during the State's current fiscal year which commenced July 1, 1971, prior to the date of the filing of this opinion.[35] In so holding, this Court has scrutinized a number of cases in which monetary payments by states, relating to the past, have been required by federal courts. *See* the cases cited and the discussion of

---

32. Suits seeking injunctions against state officials who are attempting to enforce state statutes allegedly violative of the Federal Constitution fall into different classifications. Griffin v. County School Bd. of Prince Edward County, 377 U.S. 218, 228, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); Georgia R.R. & Banking Co. v. Redwine, 342 U.S. 299, 304, 72 S.Ct. 321, 96 L.Ed. 335 (1952); Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). *See* Rosado v. Wyman, *supra* 397 U.S. at 420, 90 S.Ct. 1207, 25 L.Ed. 2d 442.

33. The Eleventh Amendment to the Constitution of the United States provides:
 The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

34. Unless perhaps in connection with regulations of HEW and/or the State of Maryland as to which this Court expresses no opinion herein. See the discussion at p. 371 in the body of this opinion.

35. See n. 34 *supra*.

several of them in Westberry v. Fisher, 309 F.Supp. *supra* at 15, n. 5, 19, 20 n. 12. *See also* Doe v. Swank, 332 F.Supp. 61 (N.D.Ill.1971); Grubb v. Sterrett, 315 F.Supp. 990 (N.D.Ind.), aff'd, 400 U.S. 922, 91 S.Ct. 187, 27 L.Ed.2d 182 (1970); Doe v. Harder, 313 F.Supp. 575 (D.Conn.), app. dismissed, 399 U.S. 902, 90 S.Ct. 2202, 26 L.Ed.2d 557 (1970); Brooks v. Yeatman, 311 F.Supp. 364 (M.D.Tenn.1970), which have been decided since *Westberry*. But in most of these cases, the Eleventh Amendment problem was apparently either not raised or not faced. And in none of them has any satisfactory reason been advanced for voiding the bar of the Eleventh Amendment.

Whether retroactive payments are required under any HEW and/or Maryland regulations dealing with the subject of "corrected payments," *see* Grubb v. Sterrett, *supra*, 315 F.Supp. at 995; Westberry v. Fisher, *supra*, 309 F.Supp. at 20–21; Robinson v. Washington, 302 F. Supp. 842, 844 (D.D.C.1968); and Solman v. Shapiro, 300 F.Supp. 409, 416 (D.Conn.1969), poses a question which has not been fully briefed or argued in this case. For that reason and, even more importantly, because this Court has confidence that if this Court's holding herein becomes final, both HEW and the State of Maryland will take such steps, if any, as are required by their respective regulations in connection with the making of retroactive payments, this Court, at this time, does not believe it necessary or advisable to state any position or comment further in connection therewith, including whether or not the Eleventh Amendment bar has been lowered by any express or implicit undertaking by Maryland in connection with its acceptance of federal funds. If further developments lead any of the parties to believe that they are entitled to any relief in this Court with regard to the failure of either HEW and/or any Maryland or local administrative agency

to make retroactive payments in accordance with its own regulations, further application for such relief may be timely made to this Court under such circumstances.

For the reasons set forth in this opinion, this Court holds that each of the plaintiffs and others respectively similarly situated are entitled to prospective relief only, but that, at least at this time, no decree or order would appear necessary to effectuate that prospective relief.[36]

It is so decreed and ordered.

### APPENDIX A

42 U.S.C. § 607, as amended in 1968, provides:

§ 607. *Dependent children of unemployed fathers; definition*

(a) The term "dependent child" shall, notwithstanding section 606(a) of this title, include a needy child who meets the requirements of section 606(a) (2) of this title, who has been deprived of parental support or care by reason of the unemployment (as determined in accordance with standards prescribed by the Secretary) of his father, and who is living with any of the relatives specified in section 606(a) (1) of this title in a place of residence maintained by one or more of such relatives as his (or their) own home.

(b) The provisions of subsection (a) of this section shall be applicable to a State if the State's plan approved under section 602 of this title—

(1) requires the payment of aid to families with dependent children with respect to a dependent child as defined in subsection (a) of this section when—

(A) such child's father has not been employed (as determined in accordance with standards prescribed by the Secretary) for at least 30 days prior to the receipt of such aid,

(B) such father has not without good cause, within such period (of not less

---

36. See the discussion at p. 369 n. 30 *supra*, adopting Mr. Justice Harlan's approach in Rosado v. Wyman, *supra*.

than 30 days) as may be prescribed by the Secretary, refused a bona fide offer of employment or training for employment, and

(C) (i) such father has 6 or more quarters of work (as defined in subsection (d) (1) of this section) in any 13-calendar-quarter period ending within one year prior to the application for such aid or (ii) he received unemployment compensation under an unemployment compensation law of a State or of the United States, or he was qualified (within the meaning of subsection (d) (3) of this section) for unemployment compensation under the unemployment compensation law of the State, within one year prior to the application for such aid; and

(2) provides—

(A) for such assurances as will satisfy the Secretary that fathers of dependent children as defined in subsection (a) of this section will be referred to the Secretary of Labor as provided in section 602(a) (19) of this title within thirty days after receipt of aid with respect to such children;

(B) for entering into cooperative arrangements with the State agency responsible for administering or supervising the administration of vocational education in the State, designed to assure maximum utilization of available public vocational education services and facilities in the State in order to encourage the retraining of individuals capable of being retrained; and

(C) for the denial of aid to families with dependent children to any child or relative specified in subsection (a) of this section—

(i) if, and for so long as, such child's father is not currently registered with the public employment offices in the State, and

(ii) with respect to any week for which such child's father receives unemployment compensation under an unemployment compensation law of a State or of the United States.

(c) Notwithstanding any other provisions of this section, expenditures pursuant to this section shall be excluded from aid to families with dependent children (A) where such expenditures are made under the plan with respect to any dependent child as defined in subsection (a) of this section, (i) for any part of the 30-day period referred to in subparagraph (A) of subsection (b) (1) of this section, or (ii) for any period prior to the time when the father satisfies subparagraph (B) of such subsection, and (B) if, and for as long as, no action is taken (after the 30-day period referred to in subparagraph (A) of subsection (b) (2) of this section), under the program therein specified to refer such father to the Secretary of Labor pursuant to section 602(a) (19) of this title.

(d) For purposes of this section—

(1) the term "quarter of work" with respect to any individual means a calendar quarter in which such individual received earned income of not less than $50 (or which is a "quarter of coverage" as defined in section 413(a) (2) of this title), or in which such individual participated in a community work and training program under section 609 of this title or any other work and training program subject to the limitations in section 609 of this title, or the work incentive program established under part C;

(2) the term "calendar quarter" means a period of 3 consecutive calendar months ending on March 31, June 30, September 30, or December 31; and

(3) an individual shall be deemed qualified for unemployment compensation under the State's unemployment compensation law if—

(A) he would have been eligible to receive such unemployment compensation upon filing application, or

(B) he performed work not covered under such law and such work, if it had been covered, would (together with any covered work he performed) have made

him eligible to receive such unemployment compensation upon filing application.

## APPENDIX B

45 C.F.R. § 233.100(a), as promulgated in 1969, provides:

§ 233.100 *Dependent children of unemployed fathers.*

(a) *Requirements for State Plans.* If a State wishes to provide AFDC for children of unemployed fathers, the State plan under Title IV—Part A of the Social Security Act must, except as specified in paragraph (b) of this section:

(1) Include a definition of an unemployed father

(i) Which shall include any father who is employed less than 30 hours a week, or less than three fourths of the number of hours considered by the industry to be full time for the job, whichever is less, and

(ii) Which may include any father who is employed less than 35 hours a week, or less than the number of hours considered by the industry to be full time for the job, whichever is less.

(2) Include a definition of a dependent child which shall include any child of an unemployed father (as defined by the State pursuant to subparagraph (1) of this paragraph) who would be, except for the fact that his parent is not dead, absent from the home, or incapacitated, a dependent child under the State's plan approved under section 402 of the Act.

(3) Provide for payment of aid with respect to any dependent child (as defined by the State pursuant to subparagraph (2) of this paragraph) when the conditions set forth in subdivisions (i) (ii), and (iii) of this subparagraph are met:

(i) His father has been unemployed for at least 30 days prior to the receipt of such aid.

(ii) Such father has not without good cause, within such 30-day period prior to the receipt of such aid, refused a bona fide offer of employment or training for employment. Before it is determined that a father has refused a bona fide offer of employment or training for employment without good cause, the agency must make a determination that such an offer was actually made. (In the case of offers of employment made through the public employment or manpower agencies, the determination as to whether the offer was bona fide, or whether there was good cause to refuse it, will be made by that office or agency.) The father must be given an opportunity to explain why such offer was not accepted. Questions with respect to the following factors must be resolved:

(*a*) That there was a definite offer of employment at wages meeting any applicable minimum wage requirement and which are customary for such work in the community;

(*b*) Any questions as to the father's inability to engage in such employment for physical reasons or because he has no way to get to or from the particular job; and

(*c*) Any questions of working conditions, such as risks to health, safety, or lack of workman's compensation protection.

(iii) Such father (a) has six or more quarters of work (as defined in subdivision (iv) of this subparagraph), within any 13-calendar-quarter period ending within 1 year prior to the application for such aid, or (b) within such 1-year period, received unemployment compensation under an unemployment compensation law of a State or of the United States, or was qualified under the terms of subdivision (v) of this subparagraph) for such compensation under the State's unemployment compensation law.

(iv) A "quarter of work" with respect to any individual means a period (of 3 consecutive calendar months ending on March 31, June 30, September 30, or December 31) in which he received earned income of not less than $50 (or which is a "quarter of coverage" as defined in section 213(a) (2) of the Act),

or in which he participated in a community work and training program under section 409 of the Act or any other work and training program subject to the limitations in such section 409, or the work incentive program established under part C of title IV of the Act.

(v) An individual shall be deemed "qualified" for unemployment compensation under the State's unemployment compensation law if he would have been eligible to receive such benefits upon filing application, or he performed work not covered by such law which, if it had been covered, would (together with any covered work he performed) have made him eligible to receive such benefits upon filing application.

(4) Provide for entering into cooperative arrangements with the State agency responsible for administering or supervising the administration of vocational education to assure maximum utilization of available public vocational education services and facilities in the State to encourage the retraining of individuals capable of being retrained.

(5) Provide for the denial of such aid to any such dependent child or the relative specified in section 406(a) (1) of the Act with whom such child is living,

(i) If, and for as long as, such child's father is not currently registered with the public employment offices in the State, and

(ii) With respect to any week for which such child's father receives unemployment compensation under an unemployment compensation law of a State or of the United States.

(6) Provide that within 30 days after the receipt of aid with respect to such children, such unemployed fathers will be referred for participation in the Work Incentive Program, as provided in section 402(a) (19) of the Act and the regulations relating thereto.

(7) Provide, where application for aid with respect to a dependent child (as defined by the State pursuant to subparagraph (2) of this paragraph) is made within 6 months after the effective date of the modification of the State plan in accordance with the provisions in subparagraphs (1) through (6) of this paragraph, that the father of such child will be considered to have met the requirements of subparagraph (3) (iii) of this paragraph if he met such requirements at any time after April 1961 and prior to the date of such application.

(8) Provide, if the approved State plan in effect prior to January 1, 1968, including aid with respect to dependent children of unemployed parents, that for purposes of subparagraph (7) of this paragraph an individual who received such aid under such plan for the last month ending before the effective date of the modification referred to in subparagraph (7) of this section will be considered to have filed application for aid under the plan as modified on the day after such effective date.

## APPENDIX C

Md.Ann.Code art. 95A, § 6 provides, in part:

§ 6. *Disqualification for benefits.*

An individual shall be disqualified for benefits—

(a) *Voluntarily leaving work.* * * *

(b) *Gross misconduct.*—For any week in which his unemployment is due to his having been discharged for gross misconduct connected with his work, if so found by the Executive Director. Such disqualification shall continue until such individual has become reemployed and has earnings therein equal to at least ten (10) times his weekly benefit amount. For the purposes of this article, the term "gross misconduct" shall include conduct of an employee which is (1) a deliberate and willful disregard of standards of behavior, which his employer has a right to expect, showing a gross indifference to the employer's interest, or (2) a series of repeated violations of employment rules proving that the employee has regularly and wantonly disregarded his obligations. Misconduct not falling within this definition shall not be considered gross misconduct.

(c) *Discharge or suspension as a disciplinary measure.* \* \* \*

(d) *Failure to apply for or accept work; determination of suitable work.* \* \* \*

(e) *Stoppage of work because of labor disputes.*—For any week with respect to which the Executive Director finds that his unemployment is due to a stoppage of work, other than a lockout, which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed, provided that this subsection shall not apply if it is shown to the satisfaction of the Executive Director that —

(1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and

(2) He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; provided, that if in any case separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purposes of this subsection, be deemed to be a separate factory, establishment, or other premises.

(f) *Pregnancy.* \* \* \*

(g) *Benefits under law of another state or of the United States.* \* \* \*

(h) *Remuneration from pensions.* \* \* \*

(i) *Dismissal payment or wages in lieu of notice.* \* \* \*

## APPENDIX D

The following excerpts from the legislative history of 42 U.S.C. § 607 would appear relevant:

In his message proposing AFDC–E legislation, President Kennedy stated:

Under the aid to dependent children program, needy children are eligible for assistance if their fathers are deceased, disabled, or family deserters. In logic and humanity, a child should also be eligible for assistance if his father is a needy unemployed worker —for example, a person who has exhausted unemployment benefits and is not receiving adequate local assistance. Too many fathers, unable to support their families, have resorted to real or pretended desertion to qualify their children for help. Many other fathers are prevented by conscience and love of family from taking this route, thereby disqualifying their children under present law.

I recommend that the Congress enact an interim amendment to the aid to dependent children program to include the children of the needy unemployed. Temporary action is recommended pending completion of a study of a permanent program to aid needy children and certain other groups now excluded from the Federal-State public assistance programs. [President's Message to Congress on Program for Economic Growth and Recovery, U.S. Code Cong. & Admin.News 1961, 87th Cong., 1st Sess., p. 1032.]

During the hearings before the House Committee on Ways and Means, the following colloquy between Mr. John W. Tramburg, of the American Public Welfare Association, and Representative Byrnes, a co-sponsor of the bill and ranking minority Committee member, occurred:

Mr. Byrnes. Well, let me put it this way. I would take it that you do not believe that we should have a test of suitability of employment as a factor in determining whether the person is involuntarily unemployed, when it comes to the relief program?

Mr. Tramburg. It seems to me that if there is a job available within the reasonable limits of his physical and mental capacities, and if he is drawing assistance and the expense of the

assistance programs, we would certainly be within reasonable rights it seems to me to expect that even if it were only temporary until something else opened, he should take it. [Hearings on H.R. 3865 before the House Committee on Ways and Means, 87th Cong., 1st Sess., p. 241 (1961).]

When the bill was being debated in the House, Representative Byrnes stated:

What the legislation does is to add the new category which says that if the breadwinner is able to work and if he is involuntarily unemployed and no work is available, we will treat that family in the same manner we treat the family when the breadwinner is dead, absent or incapacitated.

I recognize, and I think the committee recognizes, that as we move into this category of involuntarily unemployed people, we do have an additional problem, namely, the determination of whether it is really involuntary unemployment. In the case of the disabled breadwinner, you can test that readily. In the case of his absence from the home, you can test that and determine whether for a fact that situation exists. The death of the breadwinner is a certainty. But here we do get the problem of determining whether, in fact, this person is involuntarily unemployed and I put the emphasis on the word "involuntary."

If you will look at the Bill on page two, you will find the additions made by the committee to assure that aid would only go to children of the involuntarily unemployed beginning at line nine, page two, and going through to page three. That was added by the committee to try to assure that we will not be giving this relief to people who in a sense may be more or less voluntarily unemployed and who are refusing work. I think it is appropriate that this legislation is enacted on a temporary basis so that we can see how it is administered by the States and those in charge of the program

with respect to the determination of whether or not the people who receive this aid or the families who receive this aid are in a situation where the breadwinner is truly, in fact, involuntarily unemployed. I would serve notice on the Department here and now that if I am around in 1962 when this program expires, I certainly am going to want and demand detailed information as to how that aspect of the program has been administered. I think they should be in a position and should recognize now that the Committee will want to know how this aspect of the program has been administered and how it has worked. [107 Cong.Rec. 3528 (daily ed. March 10, 1961).]

Again, during the House Debate, Congressman Byrnes referred to the provisions of a section of the bill which "assure that aid would only go to children of the involuntarily unemployed * * *." 107 Cong.Rec. 3528.

But, on the same day during that debate, in answer to the question of Representative Domonick, Chairman Mills, of the House Ways and Means Committee, stated that states could, if they wished, grant AFDC benefits to strikers. 107 Cong.Rec. 3526 (daily ed. March 10, 1961).

The Report of the Senate Committee on Finance (87th Cong., 1st Sess., p. 3 (1961) stated:

Your committee's bill, as does the House-passed bill requires that a State agency administering the expanded aid to dependent children program must enter into cooperative arrangements with the State agency administering the public employment offices looking toward the employment of the unemployed parents of the children receiving aid. The arrangements which the State public assistance agency will need to have with the employment service must include provisions for appropriate registration for work and periodic reregistration of the unemployed parent of a child

and for otherwise making maximum utilization of the job placement services and other services and facilities of the employment office. The purpose of this provision is, so far as possible, to secure employment for the unemployed person in any jobs that may be available which there is not good cause for him to refuse as determined by the State.

Your committee believes that an unemployed individual whose family is receiving aid under this program should accept any reasonable offer of employment. Accordingly, the bill would require that a State plan include provisions to assure that aid is not provided if, and for as long as, the unemployed parent refuses without good cause to accept employment in which he is able to engage. Considerable latitude would be left to the State in determining the period during which assistance would be denied. It is not intended to permanently disqualify the family during subsequent periods when no offer of employment is available. The state would determine whether the parent had good cause for refusing an offer of employment.

In 1967, speaking before the Senate Committee on Finance in connection with the pending amendments, Mr. Wilbur Cohen, then Under Secretary of HEW and later to become HEW Secretary, stated:

Well, I would say, Senator, that in view of the fact that the Federal Government is spending several billion dollars in Federal funds in the welfare program, we should give priority to a total program of work and making people independent, people that are on the welfare rolls. That is a cost to the general taxpayer. These are people who the general taxpayer is supporting and to the maximum extent that it is feasible, priority should be given to helping the States and the localities have a total program in which work is a central part. . . . [Hearings on HR 1208, before the Senate Committee on Finance, 90th Cong., 1st Sess., p. 264 (1967).]

In 1967, when the House Ways and Means Committee proposed what eventually became the amendments to 42 U.S.C. § 607, its report stated with regard thereto:

A major characteristic of the law is the authority left to the States to define "unemployment." Your committee believes that this has worked to the detriment of the program because of the wide variation in the definitions used by the States. In some instances, the definitions have been very narrow so that only a few people have been helped. In other States, the definitions have gone beyond anything that the Congress originally envisioned. Your committee's bill is designed to correct this situation and to make other improvements in the program.

The overall objective of the amendments proposed by the Committee is to authorize a Federal definition of unemployment by the Secretary (but within certain limits set forth in the legislation), to tie the program more closely to the work and training program authorized by the bill, and to protect only the children of unemployed fathers who have had a recent attachment to the work force. With these changes, the committee recommends that the program become a permanent part of the Social Security Act, still on an optional basis with the States. [H.R.Rep.No.544, 90th Cong., 1st Sess., pp. 107–08 (1967). *See also* S.Rep.No.744, 90th Cong., 1st Sess., p. 160 (1967), U.S.Code Cong. & Admin. News 1967, p. 2834.]

In a July 8, 1969 message to Congress, President Nixon stated that "a worker who exercises his right to strike is not involuntarily unemployed" (115 Cong. Rec. 1853 (1969)).